**WO**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Pekin Insurance Company, | No. CV-17-01050-PHX-DLR |
| Plaintiff, | **ORDER** |
| v. | |
| Estate of Harley Krager, et al., | |
| Defendants. | |

Before the Court is Plaintiff Pekin Insurance Company's ("Pekin") motion for summary judgment (Doc. 95), which is fully briefed. Pekin requested oral argument, but after reviewing the parties' briefing and the record, the Court finds oral argument unnecessary. *See* Fed. R. Civ. P. 78(b); LRCiv. 7.2(f). For the reasons stated below, Pekin's motion is granted.

**I. Legal Standard**

Summary judgment is appropriate when there is no genuine dispute as to any material fact and, viewing those facts in a light most favorable to the nonmoving party, the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). Summary judgment may also be entered "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). A fact is material if it might affect the outcome of the case, and a dispute is genuine if a

reasonable jury could find for the nonmoving party based on the competing evidence. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

The party seeking summary judgment "bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact." *Celotex*, 477 U.S. at 323. The burden then shifts to the non-movant to establish the existence of material factual issues that "can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Anderson*, 477 U.S. at 250. The non-movant "must do more than simply show that there is some metaphysical doubt as to the material facts," and instead "come forward with specific facts showing that there is a genuine issue for trial." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986) (internal quotation and citation omitted). Conclusory allegations, unsupported by factual material, are insufficient to defeat summary judgment. *Taylor v. List*, 880 F.2d 1040, 1045 (9th Cir. 1989). If the non-movant's opposition fails to cite specifically to evidentiary materials, the court is not required to either search the entire record for evidence establishing a genuine issue of material fact or obtain the missing materials. *See Carmen v. S.F. Unified Sch. Dist.*, 237 F.3d 1026, 1028-29 (9th Cir. 2001); *Forsberg v. Pac. N.W. Bell Tel. Co.*, 840 F.2d 1409, 1417-18 (9th Cir. 1988).

## II. Background

In 2013, Harley and Mary Krager purchased a homeowner's insurance policy ("Policy") from Pekin. (Docs. 96-5; 96-7.) In doing so, the Kragers completed and signed Pekin's insurance application ("Application"), which included the following acknowledgment: "I have read the above application and I declare to the best of my knowledge and belief all of the foregoing statements are true, and that these statements are offered as an inducement to [Pekin] to issue the policy for which I am applying." (Doc. 96-7.) The Application asked a series of questions, including whether the Kragers conducted any business out of their home. The Kragers answered that they did not.

On May 6, 2016, while insured under the Policy, the Kragers' residence was

destroyed by a fire. Harley died in the fire. Afterward, Mary submitted a claim to Pekin on behalf of herself and the Krager Revocable Living Trust. As part of its investigation, Pekin hired BrightClaim to do an inventory of the personal property loss at the Krager residence. (Doc. 97-1.)

BrightClaim's field representative, Clay Olson, met with Mary and her son, Bruce Krager, to conduct an inventory. (Doc. 97-4.) The group substantially completed an inventory of the main floor of the house, which consisted of the living area. According to Olson, Mary and Bruce still needed to "come up with ages and costs of things we weren't able to determine today." (*Id.* at 2.) The inventory for the house's lower level, which consisted of the garage and workshop, proved much more complicated. (*Id.*) Olson noted that "[n]ot only are there incredible amounts of different parts of firearms, but the amount of ammunition, in every size, shape, and color . . . is spread everywhere." (*Id.*) Olson added, "[i]t is very easy to see[] that the average person cannot look at this material[] and identify it . . . ." (*Id.*) As a result, the inventory could not be completed until someone capable of identifying these items was present. (*Id.*) On July 5, 2016, BrightClaim emailed Phillip Craft at Pekin, notifying him that the Kragers still had "a number of unfinished, unsigned, inventory sheets" that could not be completed without Bruce. (Doc. 97-6.)

Based on the large inventory of firearms, ammunition, and specialized machinery on the premises, Pekin elected to investigate the nature of Harley's firearm activities. On June 14, 2016, Pekin sent a letter to Mary requesting that she provide various documents related to Harley's firearms activities. (Doc. 97-5.) More than two months later, Bruce responded via letter, offering some of the requested documents and stating that the remaining documents requested were a "work in progress" and that after he went through Harley's office he would "provide applicable records that survived enough to be legible. . . ." (Doc. 97-7.) Bruce's letter also recognized that the Kragers' "personal property inventories are in progress, but the severity of the fire has made identification of items difficult and time consuming." (*Id.*) Bruce promised to "provide inventories as they are completed." (*Id.*)

Subsequently, Pekin sent a letter to Mary's attorney, requesting that she produce the outstanding documents concerning Harley's firearm activities, allow for inspection of fire damaged items, and sit for an Examination Under Oath ("EUO"). (Doc. 97-8.) Pekin requested that Mary comply with its requests by no later than December 14, 2016. (*Id.*) On December 13, 2016, Mary's attorney responded to Pekin's letter, requesting that the document inspection and EUO "be continued until the end of January 2017, when [Bruce] believes he will have all of the documentation [] requested . . . and the inventory completed." (Doc. 97-9 at 3.) According to the letter, Bruce still needed 6-8 weeks to complete the inventory. (*Id.* at 2.)

On January 17, 2017, Pekin sent another letter to Mary's attorney, requesting an EUO with Bruce, who had "formally succeeded to the [Federal Firearm License ("FFL")]" of Harley, production of the inventories and specific documents related to Harley's firearms activities, and inspection of fire damaged items. (Doc. 97-10.) The letter proposed that production of documents occur no later than February 1, 2017, and the EUO by no later than February 3, 2017. (*Id.*) On February 3, 2017, Mary and Bruce sat for EUOs with Pekin. (Doc. 98-2.) Thereafter, Pekin sent transcripts of the EOUs to be signed by Mary and Bruce, requesting a response by no later than March 8, 2017. (Doc. 98-3.)

On March 1, 2017, Pekin received a letter from Mary's attorney demanding a coverage decision by no later than March 17, 2017. (Doc. 98-4.) Pekin requested an extension to March 31 and reminded Mary and Bruce that they still needed to submit signature pages for the EUOs. (Doc. 98-5.) On April 5, 2017, Pekin notified Mary that it intended "to deny the claim and to seek Declaratory Relief . . . ." (Doc. 98-7.)

On April 10, 2017, Pekin filed this action, asserting that it is entitled to rescind the Policy because the Kragers materially misrepresented their business activities in the home and, alternatively, that Defendants are estopped from denying that the Kragers conducted business out of their home. For relief, Pekin seeks a declaratory judgment that the Policy has been rescinded and therefore Pekin need not cover the loss. (Doc. 1.) Defendants the Estate of Harley Krager, the Krager Revocable Living Trust, and Mary filed counter-claims

for breach of contract and bad faith, arguing that coverage exists, Pekin breached the Policy by denying coverage, and that Pekin investigated and processed their claim in bad faith. (Doc. 10.) Pekin has moved for summary judgment on its claims and Defendants' counter-claims. (Doc. 95.)

**III. Discussion**

    **A. Rescission**

Arizona law allows an insurer to rescind or cancel an insurance policy because of a misrepresentation in the insurance application or "in negotiations therefor" if (1) the misrepresentation is fraudulent; (2) the misrepresentation is "material either to the acceptance of the risk, or to the hazard assumed by the insurer;" and (3) the "insurer in good faith would . . . not have issued the policy . . . if the true facts had been made known to the insurer as required either by the application for the policy or otherwise." A.R.S. § 20-1109; *see also State Comp. Fund v. Mar Pac Helicopter Corp.*, 752 P.2d 1, 5 (Ariz. 1988) (explaining that all three prongs of § 20-1109 must be satisfied even though the statute does not clearly phrase them in the conjunctive). The burden is on the insurer to prove each element. *See Valley Farms, Ltd. v. Transcon. Ins. Co.*, 78 P.3d 1070, 1074 (Ariz. Ct. App. 2003). Pekin has carried its burden on all three elements.

    **1. Misrepresentation is Fraudulent**

Pekin argues that the Kragers made a fraudulent misrepresentation in their Application by denying that they conducted business at their home. Specifically, the Application asked: "Any business conducted on the premises?" (Doc. 96-7.) The Policy defines "business" as: "(a) A trade, profession or occupation engaged in on a full-time or part-time or occasional basis; or (b) *Any other activity engaged in for money* or other compensation," except for the following limited exceptions:

> (1) One or more activities, not described in (2) through (4) below, for which no "insured" receives more than $2000 in total compensation for the 12 months before the beginning of the policy period;
>
> (2) Volunteer activities for which no money is received other than payment for expenses incurred to perform the activity;

>   (3) Providing home day care services for home day services for which no compensation is received, other than a mutual exchange of services; or
>
>   (4) The rendering of home day care services to a relative of the "insured."

(Doc. 1-1 at 2.) The Kragers answered "no." (*Id.*)

The undisputed evidence establishes that the Kragers' answer was untrue; between 2013 and 2016, Harley placed advertisements, communicated with potential customers, and sold firearms out of his residence. (Doc. 96 ¶¶ 79-88.) Harley's tax filings reflect proceeds of over $18,000 in 2013 and $54,000 in 2014 from the sale of firearms. (Docs. 99-7; 99-9; 107-2 at 23-25.) Harley also possessed a FFL to deal firearms, registered his residence as his "principal place business" for purposes of his FFL, indicated to Federal authorities that he intended to derive a profit from his sales, advertise his products, and conduct sales "by appointment only," and renewed his license in May 2013. (Doc. 96 ¶¶ 1-3, 9, 14, 17, 19.)

In opposing Pekin's motion, Defendants argue, first, that the Policy's broad definition of "business" should not apply because there is no evidence that the Kragers received a copy of the Policy, which contains the definition, before signing the application.[1] (Doc. 106 at 12.) It is an axiom of contract law, however, "that a party to a contract is assumed to have read and understood the terms of a contract he or she signs." *Coup v. Scottsdale Plaza Resort, LLC*, 823 F. Supp. 2d 931, 949 (D. Ariz. 2011). "A party to a standardized contract is bound by all the terms of the contract even those terms that were not bargained for, understood, or even read by the party at the time of contracting." *Flores v. ADT Sec. Servs., Inc.*, No. 10-CV-36-TUC-FRZ (GEE), 2010 WL 6389598, at *3 (D. Ariz. June 28, 2010) (emphasis added). Here, it is undisputed that the Policy defines business. Under Arizona law, when "parties use language that is mutually intended to have a special meaning, and that meaning is proved by credible evidence, a court is obligated to enforce the agreement according to the parties' intent, even if the language ordinarily might

---
[1] Notably, Defendants do not offer evidence or even assert that they did not receive the Policy before submitting the Application.

mean something different." *Taylor v. State Farm Mut. Auto. Ins. Co.*, 854 P.2d 1134, 1139 (Ariz. 1993) (citing Restatement (Second) Contracts § 212 cmt. b, illus. 3 & 4 (1981)). Accordingly, the Policy's definition of business controls.

Defendants next argue that, even under the Policy's broad definition of business, Harley was not running a business out of his residence, and that if he was, the Kragers' answer on the Application still was not fraudulent. (Doc. 106 at 13.) Defendants rely on two pieces of evidence.

First, Defendants offer the unsigned declaration of Certified Public Accountant John Flynn, which states that Flynn advised the Kragers that Harley's "gun activity was more consistent with a hobby rather than a business," and therefore they "could treat the profit made from the sale of the guns as a capital gain rather than income" on their Internal Revenue Service filings. (Doc. 107-3 at 107-08.) This unsigned declaration does not create a genuine issue of material fact because the Court cannot consider an unsigned declaration at summary judgment. Federal Rule of Civil Procedure 56(c)(4) requires that an "affidavit or declaration used to support or oppose a motion must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated." In addition, 28 U.S.C. § 1746 requires the affiant to declare, under penalty of perjury, that the facts contained in the affidavit are true, and to sign and date the affidavit. An unsigned affidavit or declaration is an inadmissible document because there is no proof that the declarant saw the document or approved of its contents. *See, e.g.*, *Fresno Rock Taco, LLC v. Nat'l Sur. Corp.*, No. CV F 11-0845-LJO-BAM, 2012 WL 3260418, at *7 (E.D. Cal. Aug. 8, 2012); *Blaine v. Adams*, No. 05-CV-00088-DGC, 2009 WL 2824743, at *2 (E.D. Cal. Sept. 1, 2009). Moreover, even if the Court considered the affidavit, it would not create an issue of material fact because whether the revenue from Harley's sales constituted income under tax regulations is not the relevant issue. Rather, the relevant question is whether his firearm sales activity met the Policy's broad definition of "business," which includes "*Any other activity engaged in for money.*" Evidence that Harley's sales resulted in a capital gain only supports that he was engaged

in the sale of guns for money. Notably, Harley's capital gain was substantially greater than Policy's exception for earnings less than $2,000.

Second, Defendants offer Mary's EUO testimony that Harley's sales tax license was rescinded in 2010.[2] (Doc. 106 at 12-13.) Specifically, Mary testified that "the State cancelled [Harley's sales tax license] in 2010 because they said he didn't have enough going on, that they didn't want to mess with it anymore." (Doc. 107-2 at 22-23.) Defendants, however, do not provide evidence of why the State elected to not renew the sales tax license in 2010.[3] Nor do Defendants provide evidence that a sales tax license is required for all activities engaged in for money, which is how the Policy defines business. Accordingly, the State's decision not to renew a sales tax license in 2010 does not create an issue of material fact as to whether the Kragers were engaged in any activity to make money in 2013.

Alternatively, Defendants contend that even if the Kragers' answer was untrue, "it was certainly not fraudulent" because Mary believed Harley was not conducting business. (Doc. 106 at 13.) For purposes of A.R.S. § 20-1109, a showing of either legal or actual fraud is sufficient. *Equitable Life Assurance Soc'y of the U.S. v. Anderson*, 727 P.2d 1066, 1068 (Ariz. Ct. App. 1986). Pekin asserts that the Kragers' answer was a legal fraud. Legal fraud occurs when: (1) a question asked by the insurer seeks facts that are presumably within the personal knowledge of the insured; (2) the insurer would naturally contemplate that the insured's answer represented the actual facts; and (3) the answer is false. *Id.* Unlike actual fraud, legal fraud under does not require that the insured knew his statement was false or intended to defraud. *Id.* Here, it was within the Kragers' personal knowledge whether they were operating a business at their residence, the question calls for factual answer, and, for the reasons stated above, the answer was false. Accordingly, Pekin has

---

[2] The parties use sales tax license and "transaction privilege tax" interchangeably.

[3] Notably, the only evidence about Harley losing his state sales tax license comes from witness testimony. Although Mary's testimony is admissible, any discussion of what the state purportedly told her or Harley about the sales tax license would be hearsay. Defendants did not offer any records from the state explaining why or when the sales tax license was rescinded or not renewed.

- 8 -

demonstrated that there is no genuine issue of material fact as to the fraudulence prong.

### 2. Materiality

"The test of materiality is whether the facts, if truly stated, might have influenced a reasonable insurer in deciding whether to accept or reject the risk." *Admiral Ins. Co. v. AZ Air Time, LLC*, No. 15-CV-245-PHX-SRB, 2016 WL 7743026, at *4 (D. Ariz. Aug. 10, 2016) (citing *Cent. Nat. Life Ins. Co. v. Peterson*, 529 P.2d 1213, 1216 (Ariz. Ct. App. 1975)). Pekin contends that it never would have issued the Policy had it known about Harley's firearms business. (Doc. 107-3 at 29.) Because Defendants do not contest that a reasonable insurers decision would be influenced by knowledge than an insured was operating a firearms business being out of their residence, no genuine issue of material fact exists as to this prong.

### 3. Issuance of the Policy

To satisfy the third requirement of § 20-1109, Pekin must show: (1) that it would not would not have issued the policy if it had known the truth; (2) that it would not have issued the policy in as large an amount; or (3) that it would not have provided coverage with respect to the hazard resulting in loss. *Admiral Ins. Co.*, 2016 WL 7743026, at *4 (citing *State Comp. Fund*, 752 P.2d at 6). Pekin contends that it never would have issued the Policy if the Kragers had truthfully "indicted that business activities related to the dealing and manufacturing of firearms were being conducted on the premises." (Doc. 95 at 14.)

To show that it would not have issued the Policy, Pekin must demonstrate that it would not have done so even with a higher premium. *Admiral Ins. Co.*, 2016 WL 7743026, at *4 (citing *Greves v. Ohio State Life Ins. Co.*, 821 P.2d 757, 764 (Ariz. Ct. App. 1991)). This may be established through "underwriting guidelines or some other similar evidence." *See Howard v. Certain Underwriters at Lloyd's of London*, No. 09-CV-1042-PHX-GMS, 2011 WL 1103040, at *8 (D. Ariz. Mar. 25, 2011).

Pekin supports its position with the testimony of Darren Ball, Pekin's Rule 30(b)(6) deponent, who stated that, pursuant to its procedures manual, Pekin would not have issued

the Policy if there was an in-house business that involved inherently dangerous processes or equipment. (Doc. 96-8 at 2.) According to Ball, inherently dangerous means "processes and equipment that could have a significant increase in the chance of loss in both frequency and severity." (Doc. 107-3 at 38.) Additionally, Pekin's Territory Manager, Patrick Elliot, stated that "[h]ad Pekin [] been made aware that one or more of these operations [(firearm sales, firearm repair, firearm parts manufacturing and ammunition reloading)] or similar related business operations were taking place at the home, we would not have been able to provide homeowners insurance to this applicant." (Doc. 107-3 at 29.) Elliot explained that "[t]he risk and hazards involved with these types of business activities do not conform to normal exposures of a homeowners policy." (*Id.*)

Defendants contend that there is an issue of material fact as to whether Pekin would have declined to issue the Policy. (Doc. 106 at 13.) For example, Defendants argue that "Pekin insured Bruce's home after it knew he had the same FFL as his father, all of his father's firearms were in Bruce's house and Bruce was actively trying to sell his father's gun collection." (*Id.* at 17.) In support, Defendants rely on a renewal notice of Bruce's homeowner's insurance policy with Pekin, which does not support this proposition. (*Id.* at 9; 107-3 at 50-52.) The document does not cover the same residence at issue in this case, nor does it reflect that Bruce maintains an inventory of and sells firearms at his house. The renewal notice therefore does not contradict Pekin's evidence that it would not have insured Harley's home had it known he was conducting business out of it.

Defendants also contend that Pekin's actual practices contradict its stated policy. In particular, "Pekin has issued homeowners policies to 69 applicants from 2014 thru 2017 who had disclosed on the application that they operated a business in their residence." (Doc. 106 at 9.) Moreover, Pekin is unable to say how many applications for homeowner's insurance were "denied between 2010 and 2017 because the applicant was operating a business in their residence." (*Id.*) But Defendants offer no evidence that Pekin issued similar policies where homeowners operated similar businesses with inherently dangerous processes or equipment. Pekin therefore has demonstrated that there is no genuine issue

of material fact as to whether it would have declined to issue the Policy.

Accordingly, the Court grants summary judgment for Pekin on its claim for rescission based on a material misrepresentation in the Application. Pekin is entitled to rescind the Policy and, consequently, there is no coverage for Defendants' loss. Because the Court grants summary judgment on this basis, the Court need not consider Pekin's argument that Defendants were estopped from claiming coverage.

### B. Defendants' Counter-Claims

Defendants allege that Pekin breached the insurance contract by failing to pay benefits, timely investigate, and timely deny coverage. (Doc. 10 ¶¶ 34-37.) Because the Court concludes that Pekin is entitled to rescind the Policy under A.R.S. § 20–1109, the Court will enter summary judgment in favor of Pekin on Defendants' breach of contract claim.

Similarly, Pekin is entitled to summary judgment on Defendants' bad faith counter-claim. "The tort of bad faith arises when the insurer intentionally denies, fails to process or pay a claim without a reasonable basis." *Zilisch v. State Farm Mut. Auto. Ins. Co.*, 995 P.2d 276, 279 (Ariz. 2000) (internal citation omitted). To prove bad faith, an insured must show: (1) "the insurer unreasonably investigated, evaluated, or processed its claim (an objective test)"; and (2) "the insurer either knew it was acting unreasonably or acted with such reckless disregard that such knowledge may be imputed to it (a subjective test)." *Harvey Prop. Mgmt. Co., Inc. v. Travelers Indem. Co.*, No. 12-CV-1536-SLG, 2016 WL 8200625, at *3 (D. Ariz. May 12, 2016) (internal quotation and citation omitted). Here, Defendants cannot show the absence of a reasonable basis for denying benefits of the Policy because the basis of Pekin's coverage denial is reasonable as a matter of law—the Kragers made a legal misrepresentation in the Application, thereby entitling Pekin to rescind the Policy. *See Crosby v. Life Ins. Co. of Sw.*, 2010 WL 5364044, at *4 (D. Ariz. Dec. 21, 2010) (finding that an insurer is entitled to summary judgment on counter-claims for bad faith because it prevailed on its claim to rescind the policy). Defendants therefore cannot prove bad faith and Pekin is entitled to summary judgment on this claim.

**IT IS ORDERED** that Pekin's motion for summary judgment (Doc. 95) is **GRANTED**. All remaining pending motions (Docs. 85, 87) are **DENIED** as moot. The Clerk of the Court is directed to enter judgment accordingly and terminate this case.

Dated this 6th day of March, 2019.

Douglas L. Rayes
United States District Judge